**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X       Case No.

JEANNIE HOLOHAN,
                                                                                                **COMPLAINT**
                                                Plaintiff,

                        -against-                                              **PLAINTIFF**
                                                                                                **DEMANDS A**
NEWMARK & COMPANY REAL ESTATE, INC., and                       **TRIAL BY JURY**
MERRILL L. ROTH, *individually*,

                                                                Defendants.
------------------------------------------------------------------------X

          Plaintiff, JEANNIE HOLOHAN, by her attorneys, PHILLIPS & ASSOCIATES, PLLC,

hereby complains of the Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1.       Plaintiff brings this action charging that Defendants violated **Title VII of the Civil Rights**

**Act of 1964**, as amended, 42 U.S.C. § 2000e et. seq. ("Title VII"), the **New York State**

**Human Rights Law**, NYS Executive Law § 296, et. seq. ("NYSHRL"), and the **New York**

**City Human Rights Law**, New York City Administrative Code § 8-107, et. seq.

("NYCHRL"), and seeks damages to redress the injuries Plaintiff has suffered as a result

of being **sexually harassed, discriminated, and retaliated against on the basis of gender**

**(female)**.

## JURISDICTION AND VENUE

2.       Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331

and 1343.

3.       The Court has supplemental jurisdiction over the claims of Plaintiff brought under state

and city law pursuant to 28 U.S.C. § 1367.

4.       Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), based upon the fact that

the claims alleged herein took place within the Southern District of New York.

## PROCEDURAL PREREQUISITES

5.      Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunities Commission ("EEOC").

6.      Plaintiff received a Notice of Right to Sue from the EEOC, dated June 21, 2018, with respect to the herein charges of discrimination. A copy of the Notice is annexed hereto.

7.      This Action is being commenced within ninety (90) days of receipt of said Right to Sue.

## PARTIES

8.      That at all times relevant hereto, Plaintiff JEANNIE HOLOHAN ("HOLOHAN") is a resident of the State of New York and County of New York.

9.      At all times relevant hereto, Defendant NEWMARK & COMPANY REAL ESTATE, INC. ("NGKF") is a domestic corporation organized and existing as such under and by the virtue of the laws of the State of New York with a principal executive office at 125 Park Avenue, New York, New York 10017.

10.     That at all times relevant hereto, Plaintiff was an employee of Defendant NGKF.

11.     That at all times relevant hereto, Defendant MERRILL L. ROTH ("ROTH") was an employee holding the title of "Vice Chairman" for Defendant NGKF.

12.     That at all times relevant hereto, Defendant ROTH was Plaintiff's supervisor and/or had supervisory authority over Plaintiff. Defendant ROTH had the authority to hire, fire or affect the terms and conditions of Plaintiff's employment.

13.     That at all times relevant hereto, Defendants, NGKF and ROTH, are collectively referred to herein as "Defendants."

## MATERIAL FACTS

14.   On or about November 7, 2016, Plaintiff began her employment with Defendant NGKF, as a "Temporary Administrative Assistant," through Access Staffing. Plaintiff was earning a rate of $25.00 per hour.

15.   On or about March 20, 2017, Plaintiff began her employment with Defendant NGKF, earning a salary of approximately $60,008.00 per year, as an "Administrative Assistant."

16.   Plaintiff has an expected 2017 annual salary of $60,008.00 per year.

17.   At all times relevant hereto, Plaintiff was an exemplary employee and received compliments on her work performance.

18.   On or about June 1, 2017, Defendant ROTH e-mailed Plaintiff about a notepad she left in his office a few days prior. Defendant ROTH told Plaintiff, "U left your pad in my office Tuesday. Is there a reward :-)?" Plaintiff responded, "Not a bounty :) Funny!"

19.   Plaintiff was taken aback and took this as a sexually suggestive comment.

20.   In or around mid-June 2017, a fellow co-worker told Plaintiff that her attire may not adhere to the summer dress code, which runs from June 1 to Labor Day weekend.

21.   Plaintiff decided, as a precaution, to go to a nearby store and purchase different pants. Plaintiff informed Robert B. Emden ("Mr. Emden"), Executive Managing Director, and Defendant ROTH that she was going across the street. Mr. Emden acknowledged Plaintiff's request.

22.   However, Defendant ROTH told Plaintiff to come into his office and then looked at Plaintiff up and down. He then suggestively told Plaintiff, "I have no problem with what I see at all."

23.   That afternoon, Mary Roberts ("Ms. Roberts"), Director of Operations, called Plaintiff into

her office to scold Plaintiff for going out to buy new pants, when Ms. Roberts did not instruct Plaintiff to do so. Plaintiff explained that she was only doing it as a precaution, since another employee told Plaintiff that her attire may not adhere to the dress code. Ms. Roberts then stated that the employee should "shut her stupid face and stop spreading lies."

24.     Ms. Roberts continued that she had only ever instructed one employee to go buy new attire and that was because the employee's breasts were too exposed. In addition, Ms. Roberts stated that next time, Plaintiff should come to her if Plaintiff had any questions, that Plaintiff could trust her, and that she was the nicest person there.

25.     In or around end June 2017, Plaintiff complains to Ms. Roberts, that she was not comfortable doing some of her assignments for Mr. Emden, and that she notified Mr. Emden of Ms. Roberts' directions about doing work on personal items for him.

26.     Despite those instructions, Mr. Emden continued to give Plaintiff those assignments.

27.     Ms. Roberts told Plaintiff "Oh shut up and deal with it. They make the money and if anything, you should be nicer to Merrill because he makes more. Bobby is an old dinosaur."

28.     Later that day, Ms. Roberts and Mr. Emden called Plaintiff into a meeting. Ms. Roberts told Mr. Emden that if he wanted Plaintiff to do personal work for him, he had to get his own messenger account and pay for it, out of pocket. However, this did not stop Mr. Emden from sending Plaintiff personal assignments.

29.     On a number of occasions, between in or around the end of July 2017 through in or round the beginning of August 2017, Defendant ROTH required Plaintiff to come into his office and sit directly next to him to review and make edits to a presentation.

30.     On one occasion, Defendant ROTH intentionally leaned in towards Plaintiff, as he reached for various items on his desk, while reviewing the project with Plaintiff.

31. On another occasion, Plaintiff corrected Defendant ROTH on an error. In response, he grabbed the paper from Plaintiff and told her, "You think you're so smart, don't you? I wonder what else you are good at?"

32. Plaintiff took this comment as an unwanted and unlawful sexual advance.

33. On or about August 8, 2017, Plaintiff was again in Defendant ROTH's office, reviewing a project. While reviewing the project, Defendant ROTH's hand brushed against Plaintiff's thigh. In response, Plaintiff immediately moved away.

34. Then Defendant ROTH proceeded to lean in towards Plaintiff and say, "You know I'm not a sexual monster. But my wife thinks I am."

35. Plaintiff took this comment as an unwanted and unlawful sexual advance.

36. Immediately after, Plaintiff felt Defendant ROTH inching towards her, as she pulled away. Plaintiff was unsure of what to do, so she made up an excuse, saying she had to go to the bathroom, in order to get away from Defendant ROTH.

37. While Plaintiff was trying to get out of the office, Defendant ROTH told Plaintiff, "You know I understand women well."

38. Plaintiff was taken aback and took it as a sexually suggestive comment.

39. On or about Thursday, August 10, 2017, Plaintiff provided Defendant ROTH with a hard copy of a presentation she was working on for him. (the "August Project").

40. On or about Friday, August 11, 2017, Plaintiff informed Defendant ROTH that the charts in the presentation were only templates and only for placement purposes.

41. That weekend Plaintiff became ill with gastroenteritis and went to the emergency room on Monday, August 14, 2017, because she could not stop throwing up.

42. Plaintiff was ordered, by Dr. William Bagley ("Dr. Bagley"), from Mount Sinai West, to

remain home until August 17, 2017.

43.    Later that day, Plaintiff e-mailed Ikett Davis ("Ms. Davis"), Human Resources Manager, and Ms. Roberts, that she just left the hospital, was instructed to remain home until August 17, 2017, and would provide the documents to them, upon her return.

44.    On or about August 17, 2017, Plaintiff provided Ms. Davis with the hospital paperwork to verify her time out of work.

45.    Plaintiff also informed Ms. Roberts and Ms. Davis, that she cannot receive any incoming e-mails because of her home server settings, but if anyone needs her to call her.

46.    In addition, Plaintiff e-mailed Defendant ROTH and Mr. Emden, that she would be out sick.

47.    However, despite Plaintiff informing Defendant ROTH that she has no e-mail access, Defendant ROTH still e-mailed Plaintiff about a project, due upon her return.

48.    Upon her return, Plaintiff learned that she had to complete a project that day. Plaintiff immediately went to work, in order to complete the project on time.

49.    Soon thereafter, Defendant ROTH came up to Plaintiff and stood very close to her. Plaintiff responded that he did not have to stand in her personal space. However, Defendant ROTH did not move, until Plaintiff moved her chair in a manner that forced him to move. Once Plaintiff went back to work, Defendant ROTH walked away.

50.    On or about August 22, 2017, Ms. Roberts e-mailed Plaintiff to come to her office. Upon entering the office, Ms. Roberts told Plaintiff, "You really screwed up. Merrill is not happy at all!"

51.    Ms. Roberts continued that Plaintiff screwed up the entire project and that Defendant ROTH was very displeased with Plaintiff. In addition, Ms. Roberts accused Plaintiff of not

providing Defendant ROTH with the documents needed for him to review, the weekend Plaintiff got sick.

52.  In addition, Ms. Roberts accused Plaintiff of not following proper procedures, when it came to the reproduction of large projects. This was despite Abel Gonzalez ("Mr. Gonzalez"), a member of the Brokerage Service Team ("BST"), calling the copy room, to tell them that the project was coming.

53.  Despite Plaintiff having a response to each false accusation, Ms. Roberts told Plaintiff to "stop being a smartass." In addition, Ms. Roberts threatened Plaintiff by telling her, "you better send me that email where you confirmed with Merrill that you had given him a complete deck to work with on the weekend or you will never be allowed to participate in summer hours again, for insubordination."

54.  Ms. Roberts continued that Plaintiff should arrange a meeting with Defendant ROTH to apologize to him for messing up his project and for giving him an attitude.

55.  Soon thereafter, there were a number of e-mail exchanges confirming and showing proof that Plaintiff had completed her assignment on time, between Plaintiff and Ms. Roberts.

56.  On or about August 25, 2017, Ms. Roberts e-mailed Plaintiff and requested that Plaintiff meet her in the CEO's lounge at 9:30 a.m., which Plaintiff confirmed.

57.  Upon meeting with Ms. Roberts, she immediately asked Plaintiff if Plaintiff had apologized to Defendant ROTH yet. Plaintiff was confused because she thought she had already clarified her conduct with Ms. Roberts, a few days prior. Plaintiff responded that she did not have a chance to speak with Defendant ROTH.

58.  Ms. Roberts, immediately got angry and told Plaintiff, if Plaintiff valued her job, then Plaintiff better apologize to Defendant ROTH for her screw up. Ms. Roberts continued,

"you better be nice to Merrill. You're wrong regardless and he's right, so too bad. Did you know that Merrill was sick for a very long time and it was only recently that he could even give me a hug because he was so afraid of germs? He has had so many medical issues over the years and that's why he only comes in 3 times a week. He needs to be treated well."

59.    Upon returning to her desk, Plaintiff sent an e-mail to Defendant ROTH and cc'ing Ms. Roberts, requesting the meeting, as Ms. Roberts had requested.

60.    On or about September 5, 2017, Plaintiff met with Defendant ROTH.  Plaintiff asked Defendant ROTH, "What's going on?" Defendant ROTH responded, "Oh you know Mary, right?" Defendant ROTH's conduct made it clear to Plaintiff that he thought that the entire situation was a joke. Plaintiff told Defendant ROTH, "Well, I honestly, I wish that would have went better." Defendant ROTH responded, "I always know how to maneuver to my favor. I did what I had to do."

61.    Plaintiff simply responded, "ok" and asked if things were going to be good going forward and if Defendant ROTH needed anything.

62.    On or about October 6, 2017, Plaintiff received an e-mail from Defendant ROTH regarding another project. (the "October Project").

63.    Soon thereafter, Plaintiff informed Mr. Emden that she would be working on the time-consuming project with Defendant ROTH and would not be available to assist Mr. Emden. Mr. Emden became immediately annoyed by this.

64.    On or about October 11, 2017, Mr. Emden asked Plaintiff to work on a mailing list for a Benchmarks event that Defendant NGKF was having the following week. However, given to the late notice, and Plaintiff working on Defendant ROTH's project, Plaintiff told Mr. Emden that she could not make the calls.

65.   Mr. Emden continued that none of his clients were on the list and that he was offended by that. Plaintiff explained that Mr. Emden never provided her a list.

66.   Mr. Emden immediately came out of his office and began chastising Plaintiff.

67.   Soon thereafter, Plaintiff took the conversation into Mr. Emden's office because they were speaking on the main floor.

68.   David Emden ("David"), Mr. Emden's son, was also present during Plaintiff's conversation with Mr. Emden, in Mr. Emden's office.

69.   During Plaintiff and Mr. Emden's conversation, David added that Mr. Emden was sick of Plaintiff's attitude. Plaintiff responded that if Mr. Emden had a problem with her, then he could always get another assistant.

70.   In response, Mr. Emden stated, "Merrill is also sick of you." Plaintiff responded that they should not speak for others who were not in the room. In response, Mr. Emden stated that that was what Defendant ROTH said. Plaintiff responded that she did not need to be spoken to like a two-year old.

71.   Mr. Emden responds, "If this attitude keeps up, this is not going to work out."

72.   Plaintiff immediately left and went to Ms. Davis' office and explained what had just transpired. Ms. Davis told Plaintiff to go back to her desk and write it out in an e-mail to herself and Ms. Roberts.

73.   In the e-mail, Plaintiff laid out what had transpired and requested a transfer from Mr. Emden's team.

74.   On or about October 12, 2017, Plaintiff had a meeting with Ms. Davis and Ms. Roberts. Ms. Roberts explained that there was a rivalry between Defendant ROTH and Mr. Emden and that they each got jealous when Plaintiff paid attention to one more than the other.

75.  In addition, Ms. Roberts asked why Plaintiff's attitude had changed, since starting with Defendants. However, before Plaintiff could explain why her attitude had changed, from when she started to the present, Ms. Roberts told Plaintiff, "You needed the job then and I know you need the job now, so act like it."

76.  Ms. Davis then asked Plaintiff how her workload was for Defendant ROTH and Mr. Emden. Plaintiff responded that with Mr. Emden the workload was more personal, while Defendant ROTH's work load was more work related.

77.  Ms. Roberts told Plaintiff that there may be changes to coverage in 2018, which gave Plaintiff hope of a transfer from working with Defendant ROTH.

78.  Ms. Roberts then yelled at Plaintiff, "Manage your time better and that whatever the brokers want, you shut up and do it." In addition, Ms. Davis adds, "It's the nature of the beast, deal with it."

79.  Before leaving, Ms. Roberts asked Plaintiff how the October Project was going, to which Plaintiff responded that it was going well. Ms. Roberts also told Plaintiff to not screw it up like last time.

80.  On or about October 13, 2017, Plaintiff e-mailed Defendant ROTH the "slide stack" for the project and informed him that she would be sending him a number of additional attachments.

81.  On or about October 16, 2017, Plaintiff comes in to work to find e-mails, dated Sunday, October 15, 2017, from Defendant ROTH, about the exact documents Plaintiff had already sent him.

82.  In response, Plaintiff e-mailed Defendant ROTH informing him that she had already sent him the document and that she does not have any access to e-mails over the weekend.

Plaintiff also forwarded the original e-mail to Defendant ROTH.

83.    Soon after, Plaintiff e-mailed Ms. Roberts explaining the continuing issues she was having with Defendant ROTH.

84.    Approximately a half hour later, Defendant ROTH e-mailed Plaintiff claiming that he could not get in touch with her. Plaintiff responded, by e-mail, that she was working on the photos and would call him before 10 a.m.

85.    However, despite calling Defendant ROTH before 10 a.m., he did not pick up. Plaintiff immediately followed up her missed calls with an e-mail.

86.    Soon thereafter, Plaintiff heard Ms. Roberts yelling her name. Ms. Roberts began scolding Plaintiff for sending her so many e-mails and told Plaintiff to stop screwing up the project.

87.    Upon returning to her desk, Plaintiff sent Ms. Roberts a detailed e-mail explaining what had transpired between her and Defendant ROTH, including the fact that he did not read any of the e-mails she had sent him.

88.    Between on or about October 16, 2017 and on or about October 19, 2017, Defendant ROTH continued to harass Plaintiff over mistakes that he was actually making.

89.    On or about October 19, 2017, Plaintiff sent an e-mail to Defendant ROTH clarifying an issue with him that he may have been using older draft of documents.

90.    Soon thereafter, Defendant ROTH came out and told Plaintiff to send the work to the printers, despite her already doing so. Plaintiff was forced to re-send the documents because Defendant ROTH canceled the print.

91.    On or about November 21, 2017, Plaintiff had a meeting with Defendant ROTH, Ms. Roberts, and Mr. Emden.

92.    During this meeting, Plaintiff was issued a written warning, authored by Defendant ROTH.

Defendant ROTH alleged that Plaintiff failed to complete the October Project, which resulted in him having to outsource the project, in order for it to be completed on time.

93.   In addition, the written warning mentioned Plaintiff's attitude, insubordinate behavior, making Defendant ROTH come out of his office to get Plaintiff, and getting into an alleged altercation with him on the main office floor, leading to his embarrassment.

94.   As Plaintiff was reading the written warning, Plaintiff looked up to find Defendant ROTH smirking.

95.   Once Defendant ROTH and Mr. Emden left, Ms. Roberts told Plaintiff that she knows at least 50% of the statements in the written warning were true.

96.   Plaintiff responded by telling Ms. Roberts that she did everything she had to do.

97.   Immediately, Ms. Roberts began to verbally attack Plaintiff. Ms. Roberts stated, "Merrill is not a vindictive man. When he writes something, he puts a lot of time and energy into it. He is such a good man. If you can't work with him, what do I need you for? You are not doing your job and displeasing him."

98.   Plaintiff did not respond and left.

99.   That evening, Plaintiff sent an e-mail to the Defendant NGKF's main Human Resources office, in California, requesting a transfer from working with Defendant ROTH.

100.  Soon thereafter, Ashley Mirhosseini ("Ms. Mirhosseini"), Junior H.R. Generalist, e-mailed Plaintiff, and cc'd Sowmya Sukumar ("Ms. Sukumar"), Human Resources Generalist, and Ms. Davis.

101.  Later, Plaintiff followed up this e-mail to tell Ms. Mirhosseini that she was concerned about dealing with the New York City office staff and that she was already on a warning.

102.  On or around November 22, 2017, Plaintiff returns to work and received an inter-office e-

mail from Ms. Sukumar asking Plaintiff to come meet her next week.

103.   On or about November 27, 2017, feeling physically and mentally unable to deal with the hostile work environment, Plaintiff e-mailed Ms. Roberts, Ms. Davis, and Ms. Sukumar, about not being able to come into work.

104.   On or about November 28, 2017, Plaintiff had a meeting with Ms. Sukumar and Ms. Davis, about Defendant ROTH's unlawful sexual harassment.

105.   Plaintiff specifically identified: (1) when Defendant ROTH asked if there was a reward for finding Plaintiff's notepad; (2) when Defendant ROTH looked Plaintiff up and down, when she told him she was going to go buy a proper pair of pants for work; and (3) the multiple comments about him wanting to sit next to her.

106.   Plaintiff also explained that because she did not acquiesce to his conduct, all the projects she was working on began having multiple errors.

107.   Ms. Davis told Plaintiff that she had to talk to legal about where Plaintiff would have to go be reassigned.

108.   On or about November 30, 2017, Plaintiff had a continuation meeting with Ms. Davis and Ms. Sukumar. During this meeting, Ms. Davis informed Plaintiff that Defendant ROTH, Mr. Emden, and Ms. Richards, would not be involved in the process.

109.   Plaintiff also went into details about all of the instances where Defendant ROTH retaliated against her for not acquiescing to his sexual harassment. This included going into detail about: (1) what she meant by "sexual monster"; (2) how Defendant ROTH told her that he "understands women"; (3) Defendant ROTH forcing her to sit directly next to him, in particular when they were review the project from August and Defendant ROTH touching her thigh in the process; and (4) Defendant ROTH leaning in towards her.

110.   Plaintiff continued that the environment was abusive because she was not acquiescing to Defendant ROTH's unlawful conduct. In addition, Plaintiff clarified that the conduct was sexually suggestive, rather than Defendant ROTH explicitly flirting with her.

111.   Ms. Davis told Plaintiff that the other administrative assistants support five (5) to six (6) brokers. In response, Plaintiff asked, "Are they [Defendant ROTH and Mr. Emden] that difficult to work with that no one else wants them? I can handle five to six brokers with no problem. I managed a group of 25 brokers in Nomura."

112.   Towards the end of the conversation, Ms. Davis asked Plaintiff about what she wanted to do. Plaintiff agreed that she wanted to work in another department, other than the Brokerage Department. However, Plaintiff took this back because she felt that the hostile work environment would not change. Ms. Davis acknowledged that the brokers "talk."

113.   As of November 30, 2017, Plaintiff had not received any updates about the investigation, nor a copy of the November 21st Written Warning.

114.   On December 6, 2017, Plaintiff was terminated from her position in retaliation for complaining of sexual harassment.

115.   Plaintiff was unlawfully treated, humiliated, degraded, victimized and embarrassed and, as a result, suffers loss of rights, emotional distress, and physical ailments and injuries.

116.   Defendants' actions and conduct were intentional and intended to harm Plaintiff.

117.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

118.   Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff demands punitive damages as against all the

Defendants, jointly and severally.

**FIRST CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER TITLE VII**
**(Not Against Individual Defendant)**

119.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

120.  This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., for relief based upon the unlawful employment practices of the Defendants. Plaintiff complains of Defendant NGKF violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's gender.

121.  Defendant NGKF engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against Plaintiff because of her gender (female).

**SECOND CAUSE OF ACTION**
**FOR RETALIATION UNDER TITLE VII**
**(Not Against Individual Defendants)**

122.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

123.  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

124.  Defendant NGKF engaged in unlawful employment practice prohibited by 42 U.S.C. § 2000e et seq. by discriminating against Plaintiff with respect to the terms, conditions or privileges of

employment because of her opposition to the unlawful employment practices of the Defendant NGKF.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

1.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

2.  Executive Law § 296 provides that

> 1. It shall be an unlawful discriminatory practice:  "(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, **sex**, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

3.  Defendants violated the section cited herein as set forth.

## AS A FOURTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK STATE LAW

4.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

5.  Executive Law § 296 provides that, "7. It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article."

6.  Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiffs because of their opposition to the unlawful employment practices of the Defendants.

**AS A FIFTH CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER STATE LAW**

7.      Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

8.      New York State Executive Law § 296(6) provides that it shall be an unlawful

discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of

any acts forbidden under this article, or attempt to do so."

9.      Defendant ROTH violated the section cited herein as set forth.

**AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

125.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

126.    New York City Administrative Code §8-107(1) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or
> an employee or agent thereof, because of the actual or perceived age,
> race, creed, color, national origin, **gender**, disability, marital status,
> sexual orientation or alienage or citizenship status of any person, to
> refuse to hire or employ or to bar or to discharge from employment
> such person or to discriminate against such person in compensation or
> in terms, conditions or privileges of employment.

127.    Defendants engaged in an unlawful discriminatory practice in violation of New York City

Administrative Code §8-107(1)(a) by creating and maintaining discriminatory working

conditions, and otherwise discriminating against Plaintiff because of her gender (female).

**AS A FOURTH CAUSE OF ACTION FOR RETALIATION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

128.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

129.    The New York City Administrative Code §8-107(7) provides that it shall be unlawful

17

discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

130.   Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(7) by discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of the Defendants.

### AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE (Against Individual Defendant)

131.   Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

132.   The New York City Administrative Code §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

133.   Defendant ROTH engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

### JURY DEMAND

134.   Plaintiff hereby requests a jury trial.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A.   Declaring that Defendants engaged in unlawful employment practices prohibited by the **Title VII of the Civil Rights Act of 1964**, and the **New York State Human Rights Law**, New York State Executive Law § 296 et seq. ("NYSHRL"), **New York City Human Rights Law**, New York City Administrative Code, §8-107 et seq. ("NYCHRL"), and, in that Defendants discriminated against Plaintiff on the basis of her sex and gender, and retaliated

against Plaintiff for complaining of this discrimination;

B.     Awarding damages to Plaintiff for all lost wages and benefits, past and future, back pay and front pay, resulting from Defendants' unlawful employment practices and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C.     Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation;

D.     Awarding Plaintiff punitive damages;

E.     Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

F.     Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

Dated: New York, New York
       July 11, 2018

**PHILLIPS & ASSOCIATES,**
**ATTORNEYS AT LAW, PLLC**

_____
Marjorie Mesidor, Esq.
Brittany A. Stevens, Esq.
*Attorneys for Plaintiff*
45 Broadway, Suite 620
New York, New York 10006
T: (212) 248 - 7431
F: (212) 901 - 2107
mmesidor@tpglaws.com
bstevens@tpglaws.com

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: Jeannie Holohan<br>133 West 89th Street, Unit 13<br>New York, NY 10024 | From: Boston Area Office<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |

| | |
|---|---|
| ☐ | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2018-01562 | **Adriana Gomez,**<br>**Investigator** | (617) 565-3203 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Kenneth An*                                         JUN 21 2018

Enclosures(s)

Feng K. An,
**Area Office Director**                              *(Date Mailed)*

cc:  **NEWMARK & COMPANY REAL STATE, INC**
C/O Emily Miligan, Assistant General Counsel
**110 East 59th St., 7th Fl.**
**New York, NY 10022**

**Marjorie Mesidor**
**45 Broadway, Suite 620**
**New York, NY 10006**

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS  --  **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Courts often require that a copy of your charge must be attached to the complaint you file in court.  If so, you should remove your birth date from the charge.  Some courts will not accept your complaint where the charge includes a date of birth.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS  --  **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice *and* within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION  --  **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE  --  **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*